**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

**JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5**, on behalf of themselves and others similarly situated,

*Plaintiffs*,

v.

**RICHARD L. SWEARINGEN**, in his official capacity as Commissioner of the Florida Department of Law Enforcement,

*Defendant*.

Civil Case No. ____________

# VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## Introduction

1. Florida law requires all persons convicted of certain sexual offenses to register intimate details of their lives with a public registry. The requirement is for life. As a result, there are approximately 20,235 Floridians who have completed all aspects of their sentence—including post-incarceration supervision—yet must continually update these details for the rest of their lives. One particularly onerous provision requires all registrants to provide all their "Internet identifiers"—which

may include every email, login, or username they have, as well as every website, application, or program they use—*before* using them. This provision renders it nearly impossible for registrants to engage in any online speech, whether personal or professional. Failure to comply is a third-degree felony, carrying up to a five-year prison sentence.

2. The Internet identifier provision chills the exercise of Internet speech by imposing burdensome restrictions, bans anonymous online speech, is unreasonably vague and overbroad, and therefore violates the First Amendment. Moreover, the definition of Internet identifiers is so vague that it is nearly impossible for a person of ordinary intelligence to discern what information must be reported and under what circumstances, rendering the provision void for vagueness, in violation of the Due Process Clause of the Fourteenth Amendment. Five federal courts have already concluded that similar laws are unconstitutional for these reasons. Finally, the provision violates the Florida Constitution's rights to privacy and substantive due process of law.

3. Plaintiffs are five registrants who have completed their sentences and seek to reclaim their right to engage in basic online speech without severely burdensome restrictions. They bring this action for declaratory and injunctive relief, and seek to enjoin enforcement of the statute.

4. Although Plaintiffs seek to enjoin the current Internet identifier provision, a new version will go into effect on October 1, 2016, which will expand the reporting requirements to a ruinous and crippling degree. It will effectively ban registrants from using the Internet and shut down their technology and Internet-based businesses, leaving them unemployed, unconnected to the outside world, and unable to provide for their families. To avert these devastating outcomes, Plaintiffs seek expedited relief in the form of a Temporary Restraining Order or Preliminary Injunction to prevent the new version from taking effect on October 1.

## Jurisdiction and Venue

5. This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

6. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

7. Venue properly lies within this District under 28 U.S.C. § 1391(b). The Defendant performs his official duties in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims have occurred or will occur in this District.

## Parties

8. Plaintiff John Doe 1 is subject to the lifetime registration requirements because of a qualifying offense that occurred 22 years ago. It did not involve the Internet or a minor, and he has committed no offense since then. He has completed all aspects of his sentence, and is not currently on probation, parole, or any other form of criminal supervision. He is a "sexual offender" as defined by Florida Statute § 943.0435(1)(h). He seeks to proceed anonymously because he fears the retaliation and harassment that he might face if forced to publicly reveal his status as a sexual offender.

9. Plaintiff John Doe 2 is a former state police officer who is subject to the lifetime registration requirements because of a qualifying offense that occurred over nine years ago, for which the trial court withheld adjudication.[1] The offense did not involve the Internet, and he later married the victim. He has never committed another offense. Although he and his wife are now separated, he has been awarded sole custody of their six-year-old child. He holds Masters Degrees in Business Administration and Criminology. He has completed all aspects of his

[1] Florida law permits a criminal court judge to withhold adjudication of guilt only "[i]f it appears to the court upon a hearing of the matter that the defendant is not likely again to engage in a criminal course of conduct and that the ends of justice and the welfare of society do not require that the defendant presently suffer the penalty imposed by law." Fla. Stat. § 948.01(2). A person for whom adjudication is withheld is not considered to have been "convicted" of the offense for most purposes. However, they must still comply with the registry requirements.

sentence, and is not currently on probation, parole, or any other form of criminal supervision. He is a "sexual offender" as defined by Florida Statute § 943.0435(1)(h). He seeks to proceed anonymously because he fears the retaliation and harassment that he might face if forced to publicly reveal his status as a sexual offender.

10. Plaintiff John Doe 3 is subject to the lifetime registration requirements because of a qualifying offense that occurred 18 years ago. It did not involve use of the Internet. He has committed no other sexual offense. He has completed all aspects of his sentence, and is not currently on probation, parole, or any other form of criminal supervision. He is a "sexual offender" as defined by Florida Statute § 943.0435(1)(h). He seeks to proceed anonymously because he fears the retaliation and harassment that he might face if forced to publicly reveal his status as a sexual offender.

11. Plaintiff John Doe 4 is subject to the lifetime registration requirements because of a qualifying offense that occurred 19 years ago. It did not involve the Internet, and both he and the victim were minors at the time (he was 17 and she was 14). He was sentenced as a youthful offender, which is generally reserved for first time offenders who are under 21 at the time of sentencing, with sentences restricted to 6 years or less. *See* Fla. Stat. § 958.04. He has committed no other sexual offense since then. He has completed all aspects of his sentence, and is not

currently on probation, parole, or any other form of criminal supervision. He is a "sexual offender" as defined by Florida Statute § 943.0435(1)(h). He seeks to proceed anonymously because he fears the retaliation and harassment that he might face if forced to publicly reveal his status as a sexual offender.

12. Plaintiff John Doe 5 is subject to the lifetime registration requirements because of a qualifying offense that occurred 23 years ago, for which the trial court withheld adjudication. It did not involve the Internet, and both he and the victim were minors at the time. He has committed no offense since then. He has completed all aspects of his sentence, and is not currently on probation, parole, or any other form of criminal supervision. He is a "sexual offender" as defined by Florida Statute § 943.0435(1)(h). He seeks to proceed anonymously because he fears the retaliation and harassment that he might face if forced to publicly reveal his status as a sexual offender.

13. Defendant Richard L. Swearingen is the Commissioner (also known as the Executive Director) of the Florida Department of Law Enforcement (FDLE), which is responsible for implementing many of Florida's registration requirements. These requirements include creation and maintenance of the registry and the website containing information about the registrants; creation and maintenance of the forms specifying information that must be registered, including the information required by the definition of the term "Internet identifier"; and disclosure of the information

to law enforcement agencies, commercial social networking websites, and the public. He has statutory authority to implement the relief Plaintiffs seek. *See* Fla. Stat. § 943.03. References to the Commissioner or the FDLE in this Complaint are referring to Defendant. At all relevant times, Defendant Swearingen and his agents acted, and continue to act, under color of state law.

## GENERAL FACTS

### Florida's Sex Offender Registration Scheme

14. In Florida, every person who has been convicted of one of a long list and wide variety of sex-related offenses, including convictions that occurred before the registry went into effect in 1997, must register as a sexual offender for life.[2] *See* Fla. Stat. § 943.0435. Because the qualifying offenses are numerous, the registration statute is retroactive, and the duty to register is lifetime, as of September 2015 there were 66,523 persons on the registry.

[2] There is a mechanism through which sexual offenders can request to be removed from the registry if they have been arrest-free for 25 years following the end of their criminal supervision, but there are numerous disqualifying convictions, and the removal decision is left to the discretion of the circuit court. Fla. Stat. § 943.0435(11).

Approximately 20,235 of those reside in Florida and have completed all aspects of their sentence, including post-incarceration supervision.[3]

15. Registration is mandatory once a qualifying conviction is entered; a sentencing court has no discretion to exempt criminal defendants from the registration requirements. Fla. Stat. § 943.0436. The duty to register applies without regard to any individualized assessment of risk to reoffend, and regardless of whether the offense involved the Internet or a minor.

16. Registrants are saddled with numerous burdensome requirements. They must report in person to the local Sheriff's Office within 48 hours of being released from prison or moving to a new address, and provide the following information for the registry: name; date of birth; social security number; race; sex; height; weight; hair and eye color; tattoos or other identifying marks; fingerprints; palm prints; photograph; employment information; address; current or known future temporary residence; the make, model, color, vehicle identification number (VIN), and license tag number of all vehicles owned; all home telephone numbers and cellular telephone numbers; all electronic mail addresses and all Internet identifiers; date and place of each conviction;

[3] Approximately 1,583 of those 20,235 are classified as "sexual predators," a more serious designation, who are also subject to the registration requirement. *See* Fla. Stat. § 775.21. The term "sexual offender" or "registrants" as used herein refers to everyone who must register, including sexual predators.

information about college enrollment; a brief description of the crime or crimes committed; information about any professional licenses held; and a copy of their passport. Fla. Stat. § 943.0435(2). All information must be promptly updated. Updates to certain information can be made through the FDLE's online system. § 943.0435(4)(e)(3).

17. Failure to comply with any of these requirements is a third degree felony, punishable by up to five years in prison and a $5,000 fine. Fla. Stat. § 943.0435(9)(a) & (14)(c)(4).

18. The local sheriffs are required to promptly provide the information to the FDLE, which then updates the registry. Fla. Stat. § 943.0435(2)(c) & (14)(d).

19. The information provided for the registry is not kept confidential. On the contrary, the Florida Legislature has encouraged the FDLE to make the registry accessible to the public: "Releasing information concerning sexual offenders to law enforcement agencies and to persons who request such information, and the release of such information to the public by a law enforcement agency or public agency, will further the governmental interests of public safety." Fla. Stat. § 943.0435(12). *See also* Fla. Stat. § 943.043(1) ("The department may notify the public through the Internet of any information regarding sexual predators and sexual offenders which is not confidential and exempt from public disclosure under s. 119.07(1) and s. 24(a), Art. I of the State

Constitution."). The information that is confidential and exempt under Florida's public records law would be Social Security numbers and some information in a registrant's motor vehicle record. Internet identifiers are not confidential or exempt from Florida's public records law.

20. There are no restrictions on the FDLE's, or any law enforcement agency's, use of the registry information.

21. The FDLE makes the registry information public. The FDLE has created, and maintains, an online system which allows the public to search for information about any registered sexual offender. In fact, the FDLE has created a system to provide automatic notification of registration information to any member of the public who signs up for the service. *See* Fla. Stat. § 943.44353. Any information contained in the registry that is not displayed on the online system is still available to any member of the public who requests it. Fla. Stat. § 934.043(3). Moreover, the online system has a function wherein one can input an email address or username and be informed if that email or username is associated with a registered sexual offender.

22. To ensure the further spread of registrants' personal information, the FDLE is even encouraged to provide the registry information relating to email addresses and Internet identifiers to commercial social networking websites, so that these websites can screen potential users and terminate registrants' accounts.

Fla. Stat. § 943.0437(2). These websites are immunized from civil liability for removing or disabling registrants' profiles or terminating their accounts. § 943.0437(3).

## The Internet Identifier Provision

23. The Internet identifier provision states that all registrants "shall register all electronic mail addresses and Internet identifiers with the department through the department's online system or in person at the sheriff's office before using such electronic mail addresses and Internet identifiers." Fla. Stat. § 943.0435(4)(e)(1). "Department" in this statute refers to the FDLE.

24. "Electronic mail address" is defined as "a destination, commonly expressed as a string of characters, to which electronic mail may be sent or delivered." Fla. Stat. § 668.602(6); 943.0435(1)(c) (incorporating the definition from 668.602).

25. Enacted in 2014, the current definition of "Internet identifier," which will expire on October 1, 2016, is "all electronic mail, chat, instant messenger, social networking, application software, or similar names used for Internet communication, but does not include date of birth, social security number, or personal identification number (PIN)." Fla. Stat. § 775.21(i); 943.0435(1)(e) (incorporating the definition from 775.21).

26. On October 1, 2016, a new, more expansive definition will take effect. On that date and going forward, Internet identifier "includes, but is not limited to, all website uniform resource locators (URLs) and application software, whether mobile or nonmobile, used for Internet communication, including anonymous communication, through electronic mail, chat, instant messages, social networking, social gaming, or other similar programs and all corresponding usernames, logins, screen names, and screen identifiers associated with each URL or application software. Internet identifier does not include a date of birth, Social Security number, personal identification number (PIN), URL, or application software used for utility, banking, retail, or medical purposes." The new definition provides no further explanation of what "Internet identifier" means, and only describes what it "includes." (The requirement to report Internet identifiers and electronic mail addresses before use, the definitions of those terms, and the FDLE's requirement to make them publicly available without restriction are referred to herein as the "Internet identifier provision.").

27. Plaintiffs seek to enjoin the current version of the provision, but the version taking effect on October 1 will expand the reporting requirements to a ruinous and crippling degree. It will effectively ban registrants from using the Internet and shut down their technology and Internet-based businesses, leaving them

unemployed, unconnected to the outside world, and unable to provide for their families. To avert these devastating outcomes, Plaintiffs are seeking expedited review to ensure that the new version does not take effect.

28. To implement the current version of the statute, the FDLE has created an online system called the Cyber Communications System through which registrants can provide and update their email addresses and Internet identifiers. Although the current version of the statute does not use the term "website," FDLE's online system requires registrants to provide the username and the specific websites associated with those usernames. This form must be completed each time a new website and/or username will be used for Internet communication.

29. This requirement—like all registration requirements—is imposed upon all registrants, regardless of risk of danger or recidivism, and even though their offenses—such as Plaintiffs' here—occurred many years ago, without any sexual re-offense, and did not involve use of the Internet.

Compliance Problems and Burdens Imposed by the Internet Identifier Provision

30. The Internet identifier provision poses several problems for Plaintiffs, and all registrants. First, the forthcoming version makes Internet use effectively impossible because it requires registrants to constantly report the uniform resource locators (URLs) of websites they are about to visit—*before* they visit

them—if the website is used for “Internet communication” (which is undefined). A URL is the specific address of a webpage; it includes the site’s protocol, domain name, suffix, directory(ies), and specific page. It is often a long and complicated string of characters. A casual Internet user could easily visit dozens of websites each day, and, in the course of following the hyperlinks on those websites, could encounter many more URLs.[4] There is no possible way to know these URLs before visiting these sites. But even if there were, the act of constantly recording them and transmitting them to the FDLE renders Internet usage practically impossible. The burden is amplified on those working in the technology field, such as several Plaintiffs here. Indeed, as further explained below, if the new version of the statute goes into effect on October 1, several Plaintiffs operating technology or Internet-related businesses will be forced to shut those businesses down because of the burden imposed by the URL reporting requirement.

31. Second, the provision—in both the current and forthcoming versions—bans registrants from engaging in anonymous online speech, as all registrants’ online usernames and aliases are required to be provided to the

[4] For instance, the URL for the New York Times’s home page is www.nytimes.com, but one click on the top story results in this URL: http://www.nytimes.com/2016/07/28/us/politics/dnc-biden-kaine-obama.html?hp&action=click&pgtype=Homepage&clickSource=story-heading&module=span-ab-top-region&region=top-news&WT.nav=top-news&_r=0&mtrref=www.nytimes.com&gwh=4165127F10DE2C01B7D6CD40409795DE&gwt=pay (last visited July 28, 2016).

FDLE, which then discloses the information to the public. This is particularly important to Plaintiffs—and all registrants—as they are members of one of the most vilified groups in society. Revealing their status as sexual offenders exposes them to harassment, retaliation, and threats of physical violence. In fact, all Plaintiffs have experienced these ills, as detailed below. Predictably, registrants, rather than having their status revealed to the world, simply avoid online speech altogether.

32. Third, the provision is so vague that it is impossible for an ordinary person to know how to avoid criminal charges. In fact, the forthcoming version contains no actual definition of "Internet identifier"; it merely provides a list of what the definition "includes, but is not limited to." Even worse, the list contains the open-ended "or other similar program." Thus, registrants are left to guess what other similar things they may have to report to the FDLE. A wrong guess could result in a third-degree felony charge.[5]

33. Similarly, the phrase "used for Internet communication" is vague. There are many websites that require some form of username before accessing

[5] This vagueness is further illustrated by the FDLE's expansive interpretation of the current version of the statute, which only requires disclosure of "names" used for Internet communication, and not the websites with which the names will be used. Yet, the FDLE's online system requires that registrants identify the "Provider" associated with each Internet identifier, which often means the website with which the name is used. That the FDLE's interpretation deviates from the statutory text further shows the difficulty of understanding what is required.

it, or portions of it. Many of these sites, although not used primarily for "communication," do allow for some form of communication through commenting on articles, which allows users to respond to each other and essentially have a conversation. A reasonable Internet user would not know whether the statute requires disclosure of all usernames used to browse these sites.[6]

34. The phrase "application software" is also unclear. The term is generally used to describe a program on an individual computer that allows the user to accomplish a particular task, such as word processing, photo editing, database organization, spreadsheet creation, or web browsing. These include common programs like Microsoft Word and Excel, Adobe Reader, Internet Explorer, and Chrome. Many of these programs allow some form of communication—such as user help or embedding hypertext links—of which many users are unaware. It is thus unclear whether registrants must disclose every single program on their computers, and every single app on their phones, and if so, what they must disclose. Most of these programs do not have "identifiers" associated with them, or if they do, users are unaware of them.

[6] The term "Internet communication" is particularly problematic because it is unclear whether it refers only to websites *from which the user directs outgoing communications to others* (e.g., websites at which the user has posted a comment, or from which the user operates a blog), or whether it also includes websites *through which others direct communications to the user*—that is, every single website a user visits. The latter interpretation is so broad and the task of disclosing each URL so burdensome as to approach impossibility.

35. These are just some of the burdens and ambiguities with the Internet identifier provision. Because of them, registrants—including Plaintiffs here—either over-report information to the FDLE or underuse the Internet to avoid the difficult questions in understanding what, precisely, they must report. They also avoid participating in online forums organized by political and social groups for fear that disclosure of their status will result in harassment and retaliation, both by those inside such groups (resulting in ostracism) and by those outside such groups (resulting in attacks on the groups as a whole). Registrants' ability to engage in political association is thus hindered. All of the above ambiguities, and others, render the statute susceptible to arbitrary enforcement.

36. Recognizing the above problems, numerous federal courts have invalidated similar statutes in four separate states.[7]

Recidivism and Internet Use Among Sexual Offenders

37. Despite such grave burdens on registrants' constitutional rights, the Internet identifier provision actually does little to prevent Internet-facilitated sexual offenses against children. It applies to all registrants, regardless of the severity, type, or age of the underlying offense; whether it had any connection

[7] *See Doe v. Harris,* 772 F.3d 563 (9th Cir. 2014); *Doe v. Snyder*, 101 F.Supp.3d 672 (E.D. Mich. 2015); *Doe v. Nebraska*, 898 F.Supp.2d 1086 (D. Neb. 2012); *White v. Baker*, 696 F.Supp.2d 1289 (N.D. Ga. 2010); *Doe v. Shurtleff*, No. 1:08-CV-64 TC, 2008 WL 4427594 (D. Utah Sept. 25, 2008), *vacated after law amended*, 2009 WL 2601458 (D. Utah Aug. 20, 2009), *aff'd*, 628 F.3d 1217 (10th Cir. 2010).

whatsoever to the Internet; and whether the registrant committed any subsequent sexual offense. This wide net is unnecessary, as contrary to popular belief, most sex offenders do not re-offend sexually, and sex offenders have among the lowest recidivism rates of all types of offenders. Indeed, after a number of years in the community without a new arrest, a sexual offender is less likely to re-offend than a non-sexual offender is to commit an "out of the blue" sexual offense. Moreover, offenders who are classified as "low risk" pose no more risk of recidivism than do individuals who have never been arrested for a sex-related offense but have been arrested for another crime.

38. An assessment to determine the risk of re-offense could easily be done. The State of Florida completes one during civil commitment proceedings and determinations of whether to allow sex offender-probationers to visit with minors, to distinguish between registrants who pose a high risk of re-offense and those who do not. In fact, there is an inexpensive measure that is universally relied upon by experts—called the Static 99R—that is used in these proceedings for this purpose.

39. The statute's targeting of Internet use also accomplishes very little, as in only very rare cases are sex crimes against children committed by strangers encountered on the Internet. For example, a study using comprehensive arrest data from 2006 showed that only 1% of arrests for sex crimes against children

involved any sort of technology, and even fewer involved the use of the Internet. Furthermore, registered sex offenders made up only 4% of persons arrested for technology-facilitated sex crimes against youth. In addition, the vast majority (studies have shown 93%) of sex crimes against children are not committed by strangers at all, but are committed by someone known to the victim.

40. In fact, the statute contravenes public safety by exposing registrants to harassment and threats of physical violence, which have already happened to Plaintiffs and many registrants.

## **The Provision's Effect on Plaintiffs**

### The Importance of the Internet

41. The significance of the Internet for our nation's civic and political processes cannot be overstated. The Internet has become the dominant medium through which Americans learn, communicate about and engage in political activities. Indeed, in today's world, one cannot participate in civil society—whether it be through employment, social or political groups, or lobbying representatives—without the Internet.

42. The vast majority of Americans use the Internet, and the average American spends more than an hour per day online. Roughly 76% of online adults obtain at least some news online. Approximately 39% of all Americans

have engaged in some form of civic or political activity through social media beyond simply reading about political issues. And millions of Americans use the Internet to carry out their current employment, seek new employment, or further their education.

43. As a result, Americans visit a large number of different Internet sites, many of which require or permit the creation of user names, screen names, or similar identifiers, and engage in various expressive activities on these sites. The average Internet user visits well over 100 distinct web sites in a typical month, and prolific Internet users may visit far more. Internet users can and do post feedback on both recently-purchased items and their sellers, discuss news events, and advertise for and otherwise conduct their businesses.

44. Many of these websites require visitors to register and adopt a "username" if they wish to utilize any of the site's interactive features and to contribute their own "content" to the website. These interactive features may include discussion forums, chat rooms, and ratings. Websites offering these services include virtually all news and current events websites, virtually all commercial sites offering goods or services over the Internet (e.g. Amazon.com), and virtually all opinion/blog websites.

45. As of 2012, 40 percent of all American adults have engaged in some form of civic or political activity through social media and social networking websites

during the previous 12-month period, with the number exceeding two-thirds (67%) for Americans between 18 and 24—numbers that have increased in recent years. Thousands of petition drives—including those hosted at the official White House website (petitions.whitehouse.gov)—have been organized exclusively online. Many federal and state agencies allow individuals to comment on pending or proposed government action through online forums.

46. Millions of blogs dedicated to social and political matters enable ordinary citizens to express their opinions concerning current events. Social networking sites (e.g., Facebook, Twitter, and Instagram) have become staples of U.S. election campaigns; every one of the presidential candidates in the 2016 nominating races maintained an active presence on social media, as do an ever-increasing proportion of candidates for elected office at the state and local level. At the same time, local governments and public officials are also establishing official Facebook pages for city and state departments, recognizing the power of social networking for effective communication with constituents.

47. The Internet has, in short, become an essential engine for American democracy.

Plaintiff John Doe 1

48. Plaintiff John Doe 1 is subject to the lifetime registration requirements because of a qualifying offense that occurred 22 years ago. It did not involve the Internet or a minor, and he has committed no offense since then. He has completed all aspects of his sentence, and is not currently on probation, parole, or any other form of criminal supervision.

49. Currently, Doe 1 is employed as a paralegal for a law firm that handles intellectual property law. A significant part of a paralegal's job in this field involves researching possible copyright and trademark infringement claims. Most of this research is done through social media, because product and brand exposure is directly linked to social media presence. This research must be completed using his employer-attorney's social media accounts because most social media sites will not permit registered sex offenders to have accounts. Because Doe 1 would have to register his employer's social media accounts, which would connect his employer with his status, his employer no longer allows him access to the employer's social media accounts for the purpose of researching infringement claims.

50. The Internet identifier provision would also likely require registration of the employer's email addresses and Internet identifiers to which Doe 1 has access. As a result, his employer now precludes him from using legal research

tools, such as PACER and Westlaw, and from registering clients' intellectual property rights and trademarks online. The provision has severely limited Doe 1's utility as a paralegal.

51. At the end of July 2016, Doe 1 will become A+ certified (validating his skills and competence with a wide range of hardware and software systems) and will be able to create and repair software systems with multiple users, either in person at a client's location or through Internet telecommunications. He also builds SharePoint systems (allowing online information-sharing and multi-user collaboration) and develops websites. Moreover, as a software developer, he will be provided with a firm's logins for their servers, software, applications, and any other usernames and passwords that might facilitate online communication.

52. The Internet identifier provision will obstruct this work. For example, while performing tasks on a client's computer with the client's software or Sharepoint application, he would be required to register the client's information with the FDLE, stigmatizing his client by association and breaching client confidences. Relying on professional chatrooms and forum discussions that are critical to technical problem solving would be unduly burdensome. Public disclosure of his status would imperil his professional reputation, and pre-use

URL registration would be ruinously time-consuming and blight his prospects for monetizing his marketable skills.

53. In fact, if the new definition requiring pre-use disclosure of all URLs and application software is permitted to take effect on October 1, Doe 1 will not be able to do his job. He will either have to move to another position within the firm (at great cost to his employer), or simply quit, leaving him unemployed and unemployable in his field.

54. Doe 1 had a Facebook account before the Internet identifier provision was initially enacted in 2014. After registering his e-mail addresses with the FDLE, his Facebook account was deleted, thwarting his employer's desire that he create a Facebook business page for the firm. The closure of Doe 1's Facebook account has also kept him from communicating with friends who live outside of Miami and family members who live in other countries.

55. Doe 1 is keenly interested in politics. Before the Internet identifier provision, he would post comments anonymously on sites such as CNN, New York Daily News, and WSVN.com, about political issues and sex offender laws. He also enjoyed commenting about television shows on SpoilerTV and IMDB. However, because of the provision, Doe 1 refrains from commenting because of the burdens of registration and the fear that public exposure could result in online harassment and marginalization of his views.

56. Doe 1 has disclosed several email addresses and usernames to the FDLE registry. But he does not fully understand what the statute requires him to disclose because of its vague terms. As a result, he uses the Internet less than what he would like, and/or over-reports information to the FDLE that is likely not covered by the statute. When the new provision goes into effect on October 1, it will essentially prevent him from using the Internet at all—both personally and professionally—because of the burdensome nature of reporting the URLs of all the websites he would like to visit before he visits them. He is afraid of incurring a third-degree felony charge.

57. Doe 1 has already been harassed and intimidated because of his status. For instance, while he was living at his cousin's house, a neighbor called the police and, even though the address did not violate a residency restriction, the police came to confirm his whereabouts.

58. When Doe 1's daughter was three years old, she was enrolled in a preschool aftercare program. After a parent learned that Doe 1 was a registrant, the aftercare program prohibited him from coming inside to pick up his daughter. Instead, he had to park outside and wait for school staff to bring her to him.

59. In 2012, Doe 1 visited Disneyworld with his wife and daughter. The three had been there many times before, buying yearly passes and staying at on onsite hotel. But this time, he was cited for trespass because of his status. A security

guard and off-duty sheriff's deputy escorted him, his wife, and child to the hotel, where he was separated from them, and all three were detained for hours and prohibited from using a bathroom—even his daughter. They were finally released and ordered not to come back. Doe 1 fears that widened notification through publicity about the lawsuit could subject his family to even worse abuse.

60. Therefore, Doe 1 seeks to proceed anonymously in this lawsuit.

Plaintiff John Doe 2

61. Plaintiff John Doe 2 is a former state police officer who is subject to the lifetime registration requirements because of a qualifying offense that occurred over nine years ago, for which the trial court withheld adjudication. The offense did not involve the Internet, and he later married the victim. He has never committed another offense. Although he and his wife are now separated, he has been awarded sole custody of their six-year-old child. He holds Masters Degrees in Business Administration and Criminology, and has taught computer forensic science for several years at the college level. He has completed all aspects of his sentence, and is not currently on probation, parole, or any other form of criminal supervision.

62. Doe 2 is qualified to work in the Information Technology (IT) field, which includes computer repairs, cybersecurity, and software work. He wants

to pursue this work; however, to do so he would need to register all email addresses of his clients, and the many websites that use chat, instant messaging, and professional forum discussions to help research and solve technology problems. With the sheer volume of Internet identifiers generated by the work, and the provision's URL reporting requirement, his compliance would entail an inordinate amount of time and degree of distraction that would make the work practically impossible to perform. These burdens have effectively barred him from pursuing work in this field.

63. As an alternative, Doe 2 is eager to start an online business selling T-shirts. The website would require a communication function so that customers could discuss orders with him. He is afraid that by registering the website and username with the FDLE, his identity as a registrant will be disclosed to the public and hobble the business before it gets off the ground. The requirement that he register the website is also burdensome, as he would be required to register his account with the web hosting service, register that he owned the website, register email addresses he would want to create using the domain name, and register individual pages within the website, which would often change as his inventory, price lists, and other data were added to the site.

64. Doe 2 would like to use online sites to search for employment opportunities, such as LinkedIn and Monster.com, but the URL reporting

requirement will make this very difficult. Doe 2 refrains from seeking jobs from companies that require online testing, such as Best Buy, PetSmart, and Home Depot. For every job testing application, he would have to go first to the FDLE site and register his Internet identifier, including the URL. The provision has severely hindered his job search.

65. Because his adjudication was withheld, Doe 2 retained the right to vote despite his conviction. He is interested in political and social issues, and he wants to engage in online commentary and to sign online political petitions. However, he refrains from these online activities because he fears losing his anonymity and having his views discounted due to his status. Mandatory pre-use registration also burdens his ability to spontaneously express his views online.

66. Although Doe 2 has disclosed some identifiers to the FDLE, he does not fully understand what the Internet identifier provision requires him to disclose because of its vague terms. As a result, he uses the Internet less than what he would like, and/or over-reports information to the FDLE that is likely not covered by the statute. When the new statute goes into effect on October 1, it will essentially prevent him from using the Internet at all—both personally and professionally—because of the burdensome nature of reporting the URLs of all the websites he would like to visit before he visits them. He is afraid of incurring a third-degree felony charge.

67. Doe 2 has been harassed on multiple occasions because of his status. False allegations, invoking his status as a sex offender, have been made to the Florida Department of Children and Families (DCF) in an attempt to separate him from his daughter. DCF determined that the allegations were unfounded and made with malicious intent. Doe 2 has received threats stating that flyers about him will be posted everywhere he goes. Most recently, Doe 2 has received threatening texts and voice mails which led to the filing of criminal stalking charges against the person sending them.

68. Doe 2 dreads the negative consequences his daughter will endure if his status is revealed to a wider audience. He also fears that he may lose his job due to the publicity. This would be devastating, as he is his daughter's sole provider.

69. Therefore, Doe 2 seeks to proceed anonymously in this lawsuit.

Plaintiff John Doe 3

70. Plaintiff John Doe 3 is subject to the lifetime registration requirements because of a qualifying offense that occurred 18 years ago. It did not involve use of the Internet. He has committed no other sex offense. He has completed all aspects of his sentence, and is not currently on probation, parole, or any other form of criminal supervision.

71. Doe 3 constantly reads and frequently posts comments anonymously on the websites of Florida Action Committee (FAC) and California Reform Sex

Offender Laws (CARSOL), which publish news about sex offender laws. He derives emotional support from these sites, sharing other registrants' feelings of ostracism, their struggles to find jobs and housing, and their experiences of harassment by neighbors and law enforcement.

72. The statute's requirement that he register URLs will cause Doe 3 to stop commenting on the FAC and CARSOL websites because he worries that law enforcement and the public may learn his identity and harass him. He is not computer savvy and worries whether he will correctly register URLs before posting. Registering URLs is especially difficult, because on a given site URLs change and many have lengthy character strings. One typographical error could result in a felony prosecution.

73. Doe 3 manages a lawn service company with his father. To remain competitive, he would like to create a website and advertise his business online, posting before and after photos of lawns he services, providing an email address for prospective clients to contact him, and having a comment function for client reviews. He is concerned, however, that registering the website would lead to disclosure of his status, thereby damaging his business by alienating existing and potential clients.

74. Also, to create the website, he would have to register a web hosting service account with the FDLE, create the account, create and purchase the

domain name, register that he owns the domain, and register any email using the domain name. He would then have to notify the FDLE every time he added or removed a page on the website because that would change its URL. The burdens of having to register the website's Internet identifiers, including its URLs, combined with his fear of exposure, have deterred him from using the Internet to make his business more competitive.

75. Doe 3 also would like to learn how to become more proficient in using computers, the Internet, and website building. He could become more proficient by using free online tutorials. But he is reluctant to do so because he fears his present lack of knowledge could lead to an inadvertent registration error, and that public disclosure of his identifier and website would cause online learning centers to deny him access.

76. Although Doe 3 has disclosed some identifiers to the FDLE, he does not fully understand what the Internet identifier provision requires him to disclose because of its vague terms. As a result, he uses the Internet less than what he would like, and/or over-reports information to the FDLE that is likely not covered by the statute. When the new statute goes into effect on October 1, it will essentially prevent him from using the Internet at all—both personally and professionally—because of the burdensome nature of reporting the URLs of all

the websites he would like to visit before he visits them. He is afraid of incurring a third-degree felony charge.

77. Doe 3 has also faced harassment and retaliation because of his status. For instance, when his grandparents—who have lived in the same neighborhood for over 25 years—developed long-term illnesses, he moved into their home to take care of them. He had been living there for three weeks when his entire neighborhood received flyers publicizing his registrant status. At the time he had been off probation for ten years. This was extremely embarrassing and isolating not only for him, but also for his grandmother who became distraught and often cried because of it.

78. Doe 3 lost several customers in his lawn care business when a local newspaper printed a list of local registered sex offenders which included his name. The customers actually informed him that they would no longer hire him because of the newspaper's disclosure of his status. Similarly, he also was terminated from his job at Burger King when management became aware he was on the registry.

79. Therefore, Doe 3 seeks to proceed anonymously in this lawsuit.

<u>Plaintiff John Doe 4</u>

80. Plaintiff John Doe 4 is subject to the lifetime sex offender registration requirements because of a qualifying offense that occurred 19 years ago. It did not

involve the Internet, and both he and the victim were minors at the time (he was 17 and she was 14). He was sentenced as a youthful offender. He has committed no other sexual offense since then. He has completed all aspects of his sentence, and is not currently on probation, parole, or any other form of criminal supervision. He and his business associate work in the medical equipment supply industry. He has an adult daughter, and a ten-year old son of whom he shares custody.

81. Other than using and registering the company's email address, Doe 4 has avoided the Internet for communication, including all social networking sites. He is chilled by the prospect of prosecution and incarceration. One inadvertent misstep could subject him to felony prosecution, devastating his son financially and emotionally.

82. Doe 4's fear of inadvertent violation has impelled him to hire IT workers to handle every aspect of the company's Internet presence. This diminishes the profit he can earn from his business.

83. Doe 4 reads many news sites and would like to express his views there anonymously. But he refrains from comment because disclosure of his status to the public could inspire readers to spurn his ideas, and subject him to harassment and threats of physical violence.

84. Doe 4 views the Internet as an immensely rich source of information and means of communication for business and education. But, because of the

Internet identifier provision, he cannot use it. The provision essentially leaves him and his family on an island where they cannot participate in the greatest technological advancement of our time.

85. Doe 4 does not fully understand what the Internet identifier provision requires him to disclose because of its vague terms. As a result, he uses the Internet less than what he would like.

86. Doe 4 has faced harassment and retaliation because of his status. For instance, when neighbors discovered that he was a registrant, they taped signs and his registration picture all over his property. Former childhood friends stopped speaking to him when they learned of his status. He has lost jobs and been denied employment as a result of his registration. When his now-adult daughter was thirteen, her classmates learned of his status and bullied her mercilessly, which led to a rupture in their relationship which has never healed. He is filled with dread for his 10-year-old son, whose classmates have not yet learned that Doe 4 is a registered sex offender. Doe 4 now regrets having saddled his son with his own name. Being publicly associated with this litigation will greatly magnify the negative consequences to be suffered by his son.

87. Therefore, Doe 4 seeks to proceed anonymously in this lawsuit.

Plaintiff John Doe 5

88. Plaintiff John Doe 5 is subject to the lifetime sex offender registration requirements because of a qualifying offense that occurred 23 years ago, for which the trial court withheld adjudication. It did not involve the Internet, and both he and the victim were minors at the time. He has committed no offense since then. He has completed all aspects of his sentence, and is not currently on probation, parole, or any other form of criminal supervision. Doe 5 has a Bachelor's Degree in electrical engineering, and has always worked in the Internet technology field. His professional work involves electronic hardware and software engineering, electronics repair, and information technology consulting.

89. Prior to the enactment of the Internet identifier provision in 2014, Doe 5 relied upon the Internet to research engineering problems on thousands of websites. He used online discussion forums and message boards to communicate with other engineers. Sometimes he would only read the contents of a site, sometimes post an answer to another person's question, and sometimes post his own questions and wait for an answer. He had online accounts with component manufacturers, communicating with sales people and application engineers, and downloading technical specifications.

90. When the Internet identifier provision first took effect, Doe 5 was uncertain which specific activities would trigger the registration requirement.

So he stopped posting questions in online forums and participating in online discussions. Even if he were sure of the requirements, registering new identifiers (sometimes ten or more per day) would take a significant amount of his time. If the new version is allowed to take effect on October 1, he will lose what he has left of his business.

91. Doe 5 also fears public disclosure of his status as a registrant. Not only might he face harassment, but a competitor could follow the progress of his work, which is proprietary and valuable.

92. In order to avoid the negative impacts of posting on forums and discussion groups, Doe 5 has relied on alternate forms of communication such as email and telephone. But these methods cannot accomplish all the same tasks, and entail additional time and increased costs, leaving him at a competitive disadvantage.

93. Before the Internet identifier provision was enacted in 2014, Doe 5's software engineering work required him to download and evaluate apps and programs. Many apps require the user to create an identifier before allowing the download or use of a trial version. But such identifiers must be unique, and a user doesn't know if an identifier is already taken before using it. So Doe 5 would have to register an identifier with the FDLE site, then try to register it with the app. If the identifier is already taken, he would have to return to the

FDLE site, delete the previously registered identifier, and register a second choice. If the second choice is not available in the app, he would have to repeat the process. Also, Doe 5 would need to create large numbers of identifiers for the apps he developed as part of the testing process. The time and effort required to register each identifier would be overwhelming. Doe 5 has abandoned development of new apps due to the time required to comply with the statute.

94. Before the Internet identifier provision, as a consultant in information technology, Doe 5 relied heavily on the Internet to perform research into computer hardware and software products to meet his customers' needs, and to implement solutions. He had online accounts with computer hardware and software distributers. He would also use online chat sessions to receive technical support from manufacturers. Because of the Internet identifier provision, Doe 5 has refrained from using many online resources, relying instead on slower forms of communication.

95. Before the Internet identifier provision, Doe 5 used instant messaging while giving support assistance to his clients, which entailed his use of their identifiers. Registering their identifiers would disclose information about Doe 5's clients, thus breaching confidentiality and disclosing client lists to his competitors. Doe 5 has been forced to rely on text messages and telephone communication rather than instant messaging, which has deprived Doe 5 of the

ability to handle multiple support calls simultaneously, as is done by his competitors.

96. Doe 5's business has suffered because he cannot use social media to promote it or support his customers, as do many businesses today. If he used social media, his status could be disclosed to the sites, leading to account closure.

97. Prior to the Internet identifier provision, Doe 5 would engage in online political communication, reading and contributing to discussions on Florida Action Committee (FAC), California Reform Sex Offender Laws (CARSOL), and the National RSOL, organizations dedicated to assisting and restoring the civil rights of registrants. He also participated in discussions on news sites with broader political concerns, such as health care, immigration laws, and defense spending. He always used pseudonyms in these discussions. He wanted to remain anonymous because, as a member of a despised group, he feared harassment if his status were disclosed. Because the Internet identifier provision subjects him to felony prosecution for a single misstep, Doe has refrained from online political expression since it was enacted.

98. Doe 5 used to participate in online religious discussion, online support groups, and online education courses. Doe 5 used pseudonyms because he valued his anonymity and privacy. He stopped those activities because of the Internet identifier provision.

99. The version taking effect on October 1, 2016, is far more burdensome than the current version. Doe 5 would have to find the URL for each discussion or message, then detour to the FDLE registration site before participating. Each new discussion or message would require this detour, because the URL is different for each discussion or message. This would essentially make Internet communication impossible. If the new version is allowed to take effect, he would simply not be able to do his job, and would be unemployed.

100. Doe 5, a teenager at the time of his offense (he is now 41 years old), has suffered harassment for many years as a result of his status, and so has his family. He and his parents have received obscene letters at their home. His first wife was denied a job when the prospective employer learned of his status. Co-workers at a part-time job, as well as family members and other acquaintances pressed her repeatedly about why she would want a family with a sex offender. Landlords refused to rent to the couple, forcing them to move into the upper floor of his office. These stresses were a significant factor leading to their divorce. Although Doe 5 is now remarried, his new wife has chosen to keep her own name, to safeguard her employment.

101. Doe 5 has experienced his own business losses as a result of his status. He ran a dial-up internet service from 1996 to 2005, which once had about 800 subscribers. When customers learned he was on the registry, many reacted by

closing their accounts, and some demanded refunds for services already used. Doe 5 finally had to shut down the business.

102. He then began working as a computer consultant for local businesses. He soon realized that his name hurt his business, so he hired a salesperson. Once the salesperson learned he was on the registry, he started demeaning Doe 5 and abusing the expense account, so Doe 5 had to let him go and resumed working alone. Business clients who learn about his status sometimes fire him, even in the middle of a project, sometimes without paying for the work he has done. Doe 5 fears that broadcasting his status, by naming him as a plaintiff in this lawsuit, will ruin what remains of his business.

103. Therefore, Doe 5 seeks to proceed anonymously in this lawsuit.

* * *

104. In the absence of court-ordered relief, all Plaintiffs will suffer imminent, immediate, and ongoing irreparable harm in the form of loss of their anonymity, and a chilling of their free speech and associational rights. They will suffer even more grievous harm if the new version of the statute is permitted to take effect on October 1, 2016. No future award of damages can remedy the loss of these constitutional rights. The public interest and equity favor granting injunctive relief.

## CLAIMS FOR RELIEF

### Count 1: Violation of the First Amendment to the United States Constitution (via 42 U.S.C. § 1983)

105. Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all the preceding paragraphs before the Claims for Relief section, as though fully set forth herein.

106. The Internet identifier provision is unconstitutional, both facially and as applied to Plaintiffs, because it infringes on Plaintiffs' rights under the First Amendment. The provision is a content-based restriction because the speech restrictions apply based on the identity of the speaker; that is, the provision burdens speech by registrants but not others, and its purpose is to disfavor the views of registrants. The provision is not the least restrictive means of furthering a compelling government interest.

107. The provision is not narrowly tailored to serve a significant governmental interest, and does not leave open ample alternative channels of communication. It burdens substantially more speech than necessary.

108. The Internet identifier provision is so overbroad and burdensome that it prevents Internet speech altogether, and chills Internet speech.

109. The Internet identifier provision bans and chills anonymous Internet speech.

110. The Internet identifier provision is so vague that it chills Internet speech. It operates to inhibit the exercise of First Amendment freedoms because the uncertainty of its meanings lead registrants to widely avoid the unlawful zone, thus chilling speech. Registrants who read the provision too narrowly are subject to criminal punishment, and those who read it too broadly suffers a greater infringement of their First Amendment rights than the statute requires. A registrant is left to guess at its meaning.

111. The Internet identifier provision is facially overbroad because it punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep.

112. The Internet identifier provision requires the compelled disclosure of individuals with whom Plaintiffs associate, violating their right to association.

113. Pursuant to the overbreadth doctrine, the Internet identifier provision is facially unconstitutional for all registrants, not just Plaintiffs. Other registrants not before the Court desire to engage in legally protected expression but refrain from doing so because they fear the repercussions of the Internet identifier provision.

114. Defendant, acting under color of state law, has threatened to and will enforce and implement the Internet identifier provision against the individual Plaintiffs and all registrants, in violation of their First Amendment rights.

115. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have and will suffer irreparable harm, which will continue absent injunctive relief.

**Count 2: Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution: Void For Vagueness (via 42 U.S.C. § 1983)**

116. Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all the above paragraphs before the Claims for Relief section, as though fully set forth herein.

117. Section 1 of the Fourteenth Amendment prohibits a state from "depriving any person of life, liberty, or property without due process of law."

118. The Internet identifier provision is void for vagueness. It fails to provide a person of ordinary intelligence fair notice of what is prohibited, and is so standardless that it authorizes or encourages seriously discriminatory and arbitrary enforcement.

119. The Internet identifier provision is unconstitutional, both facially and as applied to Plaintiffs, under the Due Process Clause of the Fourteenth Amendment.

120. Defendant, acting under color of state law, has threatened to and will enforce and implement the provision against the Plaintiffs and all registrants, in violation of their Fourteenth Amendment due process rights.

121. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have and will suffer irreparable harm, which will continue absent injunctive relief.

## Count 3: Violation of Article I, Section 23 of the Florida Constitution: Right to Privacy

122. Plaintiffs repeat and reallege all preceding paragraphs before the Claims for Relief section, as if fully set forth herein.

123. The Internet identifier provision infringes on the right to be let alone and free from governmental intrusion into Plaintiffs' private lives. It interferes with Plaintiffs' protection against the collection, retention, and use of information related to Plaintiffs' privates lives.

124. The Internet identifier provision violates the right to privacy, both facially and as applied to Plaintiffs, as secured by Article I, Section 23 of the Florida Constitution.

125. Defendant, acting under color of state law, has threatened to and will enforce and implement the provision against the Plaintiffs and all registrants, in

violation of their privacy rights under Article I, section 23 of the Florida Constitution.

126. As a direct and proximate cause of the Internet identifier provision, Plaintiffs have suffered harm and will continue to suffer irreparable harm in the future, which will continue absent injunctive relief.

## **Count 4: Violation of Article I, Section 9 of the Florida Constitution: Substantive Due Process**

127. Plaintiffs repeat and reallege all preceding paragraphs before the Claims for Relief Section, as if fully set forth herein.

128. The Internet identifier provision burdens the fundamental right to free speech.

129. The Internet identifier provision does not satisfy strict scrutiny. It is not the least restrictive means of furthering a compelling governmental interest.

130. The Internet identifier provision is not strictly tailored to remedy the problem to which it is aimed in the most effective way, and restricts registrants' rights more than absolutely necessary

131. The Internet identifier provision violates the Due Process Clause of Article I, Section 9 of the Florida Constitution, both facially and as applied to Plaintiffs.

132. Defendant, acting under color of state law, has threatened to and will enforce and implement the provision against the Plaintiffs and all registrants, in

violation of their substantive due process rights under Article I, section 9 of the Florida Constitution.

133. As a direct and proximate cause of the Internet identifier provision, Plaintiffs have suffered harm and will continue to suffer irreparable harm in the future, which will continue absent injunctive relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Declare the Internet identifier provision unconstitutional, both facially and as applied to Plaintiffs, in violation of the First and Fourteenth Amendments to the United States Constitution; as well as Article I, Sections 9 and 23 of the Florida Constitution;

b. Preliminarily and permanently restrain and enjoin the Defendant, including all of Defendant's officers, agents, servants, employees, attorneys, and other persons in active concert or participation with Defendant, from enforcing the Internet identifier provision and from collecting and disseminating to the public registrants' Internet identifiers;

c. Award Plaintiffs their attorneys' fees and expenses in this action pursuant to 42 U.S.C. § 1988(b);

d. Award Plaintiffs their costs of suit; and

e. Grant such other and further relief as this Court deems just and proper in the circumstances.

Respectfully submitted,

Valerie Jonas, Esq.
Florida Bar No. 616079
Valeriejonas77@gmail.com
Beth Weitzner, Esq.
Fla. Bar No. 203221
beth.weitzner@att.net
WEITZNER AND JONAS, P.A.
1444 Biscayne Blvd Suite 207
Miami, FL 33132-1430
Phone (786) 254-7930

Randall C. Berg, Jr., Esq.
Fla. Bar No. 318371
*RBerg@FloridaJusticeInstitute.org*
Dante P. Trevisani, Esq.
Fla. Bar No. 72912
*DTrevisani@FloridaJusticeInstitute.org*
Erica A. Selig, Esq.
Fla. Bar No. 0120581
*ESelig@FloridaJusticeInstitute.org*
FLORIDA JUSTICE INSTITUTE, INC.
3750 Miami Tower
100 S.E. Second Street
Miami, Florida 33131-2309
305.358.2081
305.358.0910 (Fax)

*s/Valerie Jonas*___
Valerie Jonas
*s/Dante P. Trevisani*
Dante P. Trevisani

***Attorneys for Plaintiffs***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

| | |
|---|---|
| **JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5**, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**RICHARD L. SWEARINGEN**, in his official capacity as Commissioner of the Florida Department of Law Enforcement,<br><br>*Defendant*. | Civil Case No. ____________ |

**DECLARATION OF JOHN DOE 1**

I, John Doe 1, pursuant to 28 U.S.C. § 1746, make this Unsworn Declaration Under Penalty of Perjury, and declare that the statements made below are true, and state:

My name is John Doe 1. I have reviewed the Verified Complaint set forth in the above matter, and I find the facts contained therein which pertain to me to be true and accurate to the best of my knowledge and belief.

I understand that a false statement in this declaration will subject me to penalties for perjury.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 5, 2016

*s/ John Doe 1*
JOHN DOE 1

**in UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

**JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5**, on behalf of themselves and others similarly situated,

*Plaintiffs*,

v.

**RICHARD L. SWEARINGEN**, in his official capacity as Commissioner of the Florida Department of Law Enforcement,

*Defendant*.

Civil Case No. ____________

**DECLARATION OF JOHN DOE 2**

I, John Doe 2, pursuant to 28 U.S.C. § 1746, make this Unsworn Declaration Under Penalty of Perjury, and declare that the statements made below are true, and state:

My name is John Doe 2. I have reviewed the Verified Complaint set forth in the above matter and I find the facts contained therein which pertain to me to be true and accurate to the best of my knowledge and belief.

I understand that a false statement in this declaration will subject me to penalties for perjury.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 3, 2016

*s/ John Doe 2*
JOHN DOE 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

| | | |
|---|---|---|
| **JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5**, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**RICHARD L. SWEARINGEN**, in his official capacity as Commissioner of the Florida Department of Law Enforcement,<br><br>*Defendant*. | ) | Civil Case No. ____________ |

**<u>DECLARATION OF JOHN DOE 3</u>**

I, John Doe 3, pursuant to 28 U.S.C. § 1746, make this Unsworn Declaration Under Penalty of Perjury, and declare that the statements made below are true, and state:

My name is John Doe 3. I have reviewed the Verified Complaint set forth in the above matter and I find the facts contained therein which pertain to me to be true and accurate to the best of my knowledge and belief.

I understand that a false statement in this declaration will subject me to penalties for perjury.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 2, 2016

*s/John Doe 3*
JOHN DOE 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

| | |
|---|---|
| **JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5**, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**RICHARD L. SWEARINGEN**, in his official capacity as Commissioner of the Florida Department of Law Enforcement,<br><br>*Defendant*. | Civil Case No. ____________ |

**DECLARATION OF JOHN DOE 4**

I, John Doe 4, pursuant to 28 U.S.C. § 1746, make this Unsworn Declaration Under Penalty of Perjury, and declare that the statements made below are true, and state:

My name is John Doe 4. I have reviewed the Verified Complaint set forth above and I find the facts contained therein which pertain to me to be true and accurate to the best of my knowledge and belief.

I understand that a false statement in this declaration will subject me to penalties for perjury.

I declare under penalty of perjury that the foregoing is true and correct.

Date: August 3, 2016

*s/John Doe 4*
JOHN DOE 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

| | | |
|---|---|---|
| **JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, and JOHN DOE 5**, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**RICHARD L. SWEARINGEN**, in his official capacity as Commissioner of the Florida Department of Law Enforcement,<br><br>*Defendant*. | ) | Civil Case No. ____________ |

**DECLARATION OF JOHN DOE 5**

I, John Doe 5, pursuant to 28 U.S.C. § 1746, make this Unsworn Declaration Under Penalty of Perjury, and declare that the statements made below are true, and state:

My name is John Doe 5. I have reviewed the Verified Complaint set forth in the above matter and I find the facts contained therein which pertain to me to be true and accurate to the best of my knowledge and belief.

I understand that a false statement in this declaration will subject me to penalties for perjury.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 3, 2016

*/s John Doe 5*
JOHN DOE 5